# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| INTERMEC IP CORP., and<br>INTERMEC TECHNOLOGIES CORP.,<br><br>Plaintiffs-<br>Counterclaim Defendants,<br><br>v.<br><br>TRANSCORE, LP, and TRANSCORE<br>HOLDINGS, INC.,<br><br>Defendants-<br>Counterclaim Plaintiffs. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **C.A. No. N20C-03-254**<br>         **PRW CCLD** |

Submitted: August 5, 2021
Decided: August 16, 2021

## MEMORANDUM OPINION AND ORDER

*Upon Plaintiffs-Counterclaim Defendants Intermec IP Corp. and
Intermec Technologies Corp.'s Motion to Dismiss*,
**GRANTED IN PART, DENIED IN PART.**

*Upon Plaintiffs-Counterclaim Defendants Intermec IP Corp. and
Intermec Technologies Corp.'s Motion for Judgment on the Pleadings*,
**DENIED.**

*Upon Defendants-Counterclaim Plaintiffs TransCore, LP and
TransCore Holdings, Inc.'s Motion for Judgment on the Pleadings*,
**GRANTED IN PART, DENIED IN PART.**

Steven L. Caponi, Esquire, Matthew B. Goeller, Esquire, K&L GATES LLP, Wilmington, Delaware; Michael S. Nelson, Esquire, Jessica L.G. Moran, K&L GATES LLP, Pittsburgh, Pennsylvania. *Attorneys for Plaintiffs-Counterclaim Defendants Intermec IP Corp. and Intermec Technologies Corp.*

Jason A. Cincilla, Esquire, Howard P. Goldberg, Esquire, Tye C. Bell, Esquire, MANNING GROSS + MASSENBURG LLP, Wilmington, Delaware, Stephen E. Baskin, Esquire, Peter Schmidt, Esquire, KING & SPALDING LLP, Washington, D.C. *Attorneys for Defendants-Counterclaim Plaintiffs TransCore, LP and TransCore Holdings, Inc*.

**WALLACE, J.**

Plaintiffs Intermec IP Corp. and Intermec Technologies Corp. (collectively, "Intermec") and defendants TransCore, LP and TransCore Holdings, Inc. (collectively, "TransCore" or the "Company") are counterparties to a cross-license (the "License"). The License permits each party to commercialize the other's intellectual property without fear of infringement claims. In exchange, TransCore agreed to pay Intermec royalties on its sales revenue quarterly at fixed percentages. Intermec may verify the accuracy of TransCore's payments through an independent audit of the Company's quarterly reports. For those rights, Intermec agreed not to deploy TransCore's intellectual property in certain markets. This dispute concerns TransCore's payments and quarterly reports and Intermec's audit and the limits imposed on Intermec's use.

Following an audit, Intermec learned TransCore had been underpaying. So Intermec demanded the deficiency. The Company disagreed with the auditor's analysis and refused. Intermec let the discrepancy slide for almost three years and then sued. Now, it seeks breach-of-contract damages and certain declarations. The Company attacks the breach allegations as time-barred and unsupported, and insists the controversies underlying the proposed declarations are moot.

Though Intermec maintains TransCore has paid too little, the Company contends it has paid too much. Intermec's audit prompted TransCore to investigate its own records more closely. After that, TransCore determined it had been making

royalty payments on non-royalty-bearing assets. As a separate result of its search, TransCore discovered Intermec allegedly has been using the Company's intellectual property in a contractually-forbidden manner. Now, invoking express, implied, and quasi-contractual theories, the Company counterclaims for its mistaken debits, which Intermec says it has no duty refund, and for misuse, which Intermec denies.

The parties have cross-moved for judgment on the pleadings as to Intermec's claims and Intermec has moved to dismiss TransCore's counterclaims. Resolution of those motions turns on the proper interpretation of various License provisions. Based on the License's terms, TransCore can't pursue an express breach-of-contract or unjust enrichment claim for overpayment, or an implied covenant claim for misuse. To that extent, Intermec's dismissal motion is **GRANTED**. But TransCore can pursue an implied covenant claim for overpayment and an express breach-of-contract claim for misuse. Intermec's dismissal motion against those is **DENIED**.

Turning to the parties' cross-motions, the Court concludes, at this stage, the provisions undergirding Intermec's breach-of-contract claim are subject to more than one reasonable interpretations. At the pleadings stage of a contract dispute, the Court can't choose between reasonable, but differing, interpretations of ambiguous language. Discovery that may illuminate the parties' mutual intent is therefore warranted. Accordingly, the Court **DENIES** both parties' motions as to Intermec's

breach-of-contract claim. As a result, the Company's statute of limitations defense must be deferred until the parties establish the only reasonable reading of the License provisions governing that defense's viability.

Intermec's declaratory count can be decided now, however. Two of the proposed declarations must be dismissed as moot and the last, as duplicative. Accordingly, TransCore's motion against Intermec's declaratory count is **GRANTED** and Intermec's cross-motion thereon is **DENIED**.

## I. FACTUAL BACKGROUND

### A. RADIO FREQUENCY IDENTIFICATION.

Intermec and TransCore produce Radio Frequency Identification ("RFID").[1] RFID originated during World War II.[2] Then, standard issue radar could not distinguish allied planes from enemy ones. So, to avoid friendly fire, military scientists created prototypical RFID: a call and response system.[3] Using this system, pilots communicated an identifying signal through an airborne transmitter to a transponder back at base that, in turn, decoded the greeting and noted false alarms.[4]

---

[1] Compl. ¶ 15, Mar. 25, 2020 (D.I. 1).

[2] *See generally History of RFID Technology*, TRACE ID, www.trace-id.com/history-rfid-technology/ (last visited Aug. 4, 2021).

[3] *Id.*

[4] *Id.*

In other words, vintage RFID functioned like barcode, scanning aircraft and classifying its allegiance.

RFID survived the battlefield with its barcode function intact. But its primary purpose has been retooled. Now, RFID manufacturers offer tracking solutions to shipping, healthcare, security, and pharmaceutical industries.[5] End users purchase modern RFID to monitor portable assets, to authorize personnel, to manage supply chains, and to ferret out counterfeit inventory and other contraband.[6]

Together with technological advancements, today's RFID also consists of parts more valuable than the whole. That means RFID's symbiotic components,

---

[5] *See generally What Is RFID and How Does RFID Work?*, AB&R (AM. BARCODE & RFID), https://www.abr.com/what-is-rfid-how-does-rfid-work/ (last visited Aug. 4, 2021).

[6] *See generally Radio Frequency Identification (RFID)*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/radiation-emitting-products/electromagnetic-compatibility-emc/radio-frequency-identification-rfid (last updated Sept. 17, 2018); *Radio Frequency Identification (RFID): What Is It?*, U.S. DEP'T OF HOMELAND SEC., https://www.dhs.gov/radio-frequency-identification-rfid-what-it (last updated July 6, 2009).

known as "ASICs,"[7] "Inserts,"[8] "Printers,"[9] "Readers,"[10] and "Tags,"[11] are individually-patentable. That also means RFID is controlled by private patent owners. Hewing to a competitive market, patent holders have an economic incentive to exclude rivals and often press, to that end, infringement litigation. But because monopolism could have the counterproductive effect of deadlocking RFID's innovation, competitors have entered into cross-licensing agreements through which they share patent ownership in exchange for royalties and related privileges.[12] As a result, cross-license counterparties bargain for the right to infringe each other's

[7] Compl., Ex. A, RFID Cross-License at Additional Definitions (hereinafter "License") (defining "RFID ASIC" as "application specific integrated circuit . . . designed to be used in conjunction with an antenna for the purpose of creating a RFID Insert or RFID Tag").

The License is divided into two substantive "exhibits," with the second replicating section numbers enumerated in the first. So, for clarity, the Court refers to the License's provisions using "§ [X No.]-[Provision No.]" as shorthand where appropriate.

[8] *Id.* (defining "RFID Insert" as "any RFID product or device that at a minimum is capable of communicating wireless radio frequency with a RFID Reader, and includes an RFID ASIC, an antenna, and with or without a substrate" (enumeration omitted)).

[9] *Id.* (defining "RFID Printer" as "a printing or encoding/decoding apparatus which includes the capability to communicate by wireless radio frequency communication with an RFID ASIC, an RFID Insert or an RFID Tag").

[10] *Id.* (defining "RFID Reader" as "any radio frequency device . . . that . . . is capable of communicating by wireless radio frequency communication to read, encode or decode RFID Inserts or RFID Tags" (enumeration omitted)).

[11] *Id.* (defining "RFID Tag" similarly to an RFID Insert and observing that an RFID Tag "may or may not" have RFID Inserts built into them and "may include other functionality . . . [*e.g.*,] a source of power, . . . information storage and retrieval" capabilities).

[12] *See generally Sanyo Elec. Co., Ltd. v. Intel Corp.*, 2021 WL 747719, at *1 & nn.1–4 (Del. Ch. Feb. 26, 2021) (explaining cross-licensing arrangements and collecting industry background).

patents and agree, thereby, to replace federal remedies with contractual ones.[13]

## B. THE LICENSE.

Against this background, Intermec and TransCore executed the License about thirteen years ago.[14] The License covers hundreds of the parties' RFID patents (collectively, "Licensed Patents" and where appropriate, "Intermec Licensed Patents" or "Company Licensed Patents")[15] and contains definitions and terms governing royalty payments, quarterly reports, audits, and market restrictions.

### 1. Licensed Patents; Licensed Products; Royalty Payments.

Under the License, the parties' Licensed Patents are defined as those "that are owned by or licensed . . . to [Intermec or the Company and] that are necessary or useful for designing, developing, processing, manufacturing or selling RFID" ASICs, Inserts, Printers, Readers, and Tags.[16] Those components are defined collectively as "[Intermec or Company] Licensed Products."[17] More important,

---

[13] *See id.* at *1 ("Generally, a cross license . . . allow[s] each contracting party to participate in what otherwise would amount to patent infringement. Competitors in a common field come together and agree in advance that neither will be precluded by the other's patents from introducing new products or adopting new processes. As a result of the cross license, [counterparties] are effectively unable to use patents against one another." (internal quotation marks and citations omitted)); *see also License*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[14] Compl. ¶¶ 1, 15; *see generally* License.

[15] License at Attachs. 3, 4 (Schedules of Royalty-Bearing Patents).

[16] *Id.* §§ X1-1.2, X1-1.6.

[17] *Id.* § X1-1.8.

Licensed Products are Licensed Products only to the extent that, "but for" the License, their sale or transfer "would infringe one or more . . . [Intermec or Company] Licensed Patents."[18]

That matters, for two reasons. First, Intermec granted the Company permission to integrate "Intermec Licensed Patents, . . . [in order] to make, . . . use, lease, offer to sell, sell, service, export and import Licensed Products."[19] So Intermec allowed the Company to appropriate Intermec Licensed Patents in a way that, without the License, would amount to patent infringement. Consistent with the infringement disclaimer's purpose, and cooperative innovation generally, the parties declared the Company's authority to do so would terminate, in pertinent part, "upon the expiration" of Intermec Licensed Patents.[20]

Second, the Company's royalty obligations are tied to Licensed Products. Under Section 3.0 (the "Payment Provision"), the Company must pay Intermec:

> a running royalty of [(i)] 2.5% on the Net Sales Value of any Licensed RFID ASICs . . .; [(ii)] 3.0% on the Net Sales Value of any Licensed Tags [and/or] Inserts . . .; and [(iii)] 7.0% on the Net Sales Value of any Licensed Readers.[21]

---

[18]  *Id.*; *id.* § X1-1.19.

[19]  *Id.* § X1-2.1.

[20]  *Id.* at Recitals; *see id.* (defining "Term" as "January 8, 2008" until "the expiration of the last to expire of the Intermec Licensed Patents and the Company Licensed Patents").

[21]  *Id.* § X1-3.1(i)–(iii).

Those royalty duties accrue as soon as the Company "becomes entitled to receive consideration for Licensed Product[s]"[22] and must be discharged no later than "30 days following the end of the quarter in which such royalties accrue."[23] So the Company must pay Intermec royalties quarterly and at fixed percentages only on the Net Sales Value of intellectual property transactions that would have, but for the License, infringed Intermec Licensed Patents.

## 2. Quarterly Reports; Audits.

Given the quarterly deadlines, TransCore must submit quarterly reports to Intermec "30 days after the close of each quarter" "whether or not there are any royalties due."[24] The quarterly reports must, among other things, reflect TransCore's financial performance, disclose its royalty calculation methodologies, and show, in balance-sheet form, how TransCore computed the aggregate Net Sales Value on the Licensed Products it sold or transferred.[25] "[F]ailure to provide" timely and adequately-detailed reports, the License warns, results in "a material breach."[26]

---

[22] *Id.* § X2-2.1.

[23] *Id.* § X2-2.2.

[24] *Id.* § X2-3.3.

[25] *Id.* § X2-3.2.

[26] *Id.* § X2-3.3.

TransCore calculates its own royalty payments.[27]  So Intermec:

> . . . has the right, . . . through an independent Third Party, . . . to audit [TransCore's records] to verify any representations made (in quarterly reports or otherwise) by [TransCore] to Intermec about the matters described in [the provisions describing what a quarterly report must contain].[28]

The License further holds TransCore liable for any deficiency "demonstrate[d]" by the Third Party auditor and imposes a deadline for settling the bill.

> Should the results of any . . . audit by Intermec's [Third Party] representative demonstrate that any representations or payments made by Company resulted in an underpayment that exceeded more than one percent (1%) in any period, then Company will within 30 days after notice of such underpayment, pay Intermec such amount. . . .[29]

## 3. "Transportation Markets" Restrictions.

Though broad, the rights the License confers are not unlimited.  Relevant here are restrictions on the "Transportation Markets," which the License defines as

> electronic toll and traffic management . . ., public sector vehicle registration and inspection programs, airport based ground transportation management systems and taxi dispatch, railroad locomotion and wagon tracking, revenue based parking, [and] vehicle initiated mobile payment services.[30]

---

[27]  *Id.* § X2-3.2.

[28]  *Id.* § X2-3.5 (the "Audit Provision").

[29]  *Id.*

[30]  *Id.* § X1-1.18.

TransCore granted Intermec "royalty-free" access to Company Licensed Patents and Products for "use" and sale everywhere but the Transportation Markets.

> Company hereby grants . . . to Intermec a personal, world-wide . . . royalty-free right and license [to] Company Licensed Patents . . . solely outside the Transportation Markets, including the right to make, . . . use, lease, offer to sell, sell, export and import . . . Company Licensed Products.[31]

To reinforce TransCore's intent to seal the Transportation Markets, the parties drafted another provision titled as "No Rights Inside the Transportation Markets." That provision states:

> This Agreement does not expressly, by implication or otherwise, confer on Intermec . . . any license or other right, title or interest in or under any [of] Company Licensed Patents . . . in the Transportation Markets.[32]

## C. INTERMEC'S ALLEGATIONS.

### 1. The Audit.

In the summer of 2016, Intermec sought to verify the accuracy of TransCore's Q3 2012 through Q2 2016 quarterly reports (the "2012–16 Reports").[33] Intermec retained Ernst & Young LLP, an accounting firm, as its independent third-party auditor (the "Auditor").[34] Working from one of the Company's facilities and in

---

[31]  *Id.* § X1-2.3(ii).

[32]  *Id.* § X2-1.13.

[33]  Compl. ¶ 23.

[34]  *Id.* ¶¶ 4, 23.

consultation with the Company's management, the Auditor completed quantitative "fieldwork" for three days and then "follow up procedures" that lasted another five months—until March 27, 2017.[35] That day, the Auditor delivered a "findings report" (the "FR") to Intermec's parent company that summarized and explained the Auditor's analysis of the 2012–16 Reports.[36]

## 2. The Audit's Results.

The Auditor concluded the Company had underpaid Intermec approximately $1.64 million (including late fees and the audit's cost) during the examined period.[37] As support for that conclusion, the FR cited misstatements and miscalculations in the 2012–16 Reports. According to the FR, the 2012–16 Reports: (1) underreported five quarters' worth of royalties; (2) omitted three royalty-bearing line items; (3) used a Net Sales Value formula that deviated from the License's terms; and (4) inappropriately depressed the Company's overseas earnings by applying foreign-exchange losses to Net Sales Value derived from cross-border transactions.[38]

---

[35] Compl., Ex. B at §§ 2.1, 2.3, Mar. 27, 2017 Ernst & Young LLP Findings Report (the "FR").

[36] FR at 1.

[37] FR § 1.

[38] *Id.* §§ 1, 3.1–3.5. The Company disputed the Auditor's formula for calculating Net Sales Value. *Id.* § 3.3. The Auditor used the formula expressed in the License's definition of Net Sales Value. *See* License at Additional Definitions (defining Net Sales Value, *i.e.*, gross invoice price, to compute earnings derived from "multiprotocol products," FR § 3.3.). The Company asserted that it had been using an "adjusted unit price" calculation instead of gross invoice price because gross invoice price "was not consistent with the" License and failed to account for "non-royalty bearing protocols." FR § 3.3. According to the Company, an adjusted unit price obviated these

-11-

### 3. The Company's Dispute and the Parties' Post-Audit Relationship.

A month later, Intermec sent the FR to TransCore for the Company's review. TransCore, in response, disputed the Auditor's analysis.[39]  As it had during the Auditor's examination, TransCore claimed the Auditor achieved its figures by relying on a model that was inconsistent with the parties' course of performance.[40] Apparently forgetting about it, the parties' relationship continued normally until August 2019, at which time Intermec alleges, in one sentence, the Company abruptly stopped sending it quarterly reports.[41]  Intermec also intimates a "continual[]" failure by TransCore to stay current on its royalty obligations.[42]  It says nothing more.

---

issues and represented a course of performance.  *See id.* ("[TransCore] communicated that the adjusted price is the correct price to use for the royalty calculation. . . . [TransCore] indicated that [it] has not received any contrary feedback from Intermec since the inception of the contract."). *See also* Defs.' Am. Ans. & Countercls. at Countercls. ¶¶ 26–33, Feb. 1, 2021 (D.I. 26) (hereinafter "Am. Ans.") (explaining background on calculations further).

[39]  Compl. ¶¶ 28–30; *id.*, Ex. C, Apr. 28, 2017 Letter from Stephanie Schwencer, Intermec's Dir. Of Fin., to George McGraw, Transcore's Exec. Vice President.

[40]  *See supra* note 39.

[41]  Compl. ¶ 31 ("After August 16, 2019, TransCore stopped providing Intermec with the quarterly reports required by the License Agreement.").

[42]  *Id.* ¶ 32 ("Upon information and belief, TransCore has continually failed to pay all royalties owed to Intermec. . . .").

**D. TRANSCORE'S ALLEGATIONS.**

**1. The Company's Overpayments.**

In addition to disputing the FR on the merits, TransCore found the Auditor's analysis to prove too much. The FR determined the Company: (1) made duplicate payments 28 times; and (2), separately, overpaid for "products and . . . services . . . not subject to royalty payment."[43] The latter conclusion led the Company to believe it mistakenly overpaid Intermec approximately $1.94 million in royalties.[44] As support for its figure, TransCore identified royalties paid on specific Licensed Products that either did not integrate Intermec Licensed Patents or erroneously integrated Intermec Licensed Patents that were expired at the time the underlying Licensed Product had been transacted.[45] According to TransCore, Intermec has refused to reimburse these overpayments.[46]

**2. Misuse in the Transportation Markets.**

In the spirit of investigation, TransCore, at this time, also looked more closely at Intermec's operations. In doing so, TransCore learned Intermec allegedly had been using Company Licensed Patents, Products, or both, in violation of the

---

[43]  FR §§ 3.5–3.6.

[44]  Am Ans. ¶¶ 55, 69.

[45]  *Id.* ¶¶ 55–69.

[46]  *E.g., id.* ¶ 78.

License's territorial restrictions.[47] According to TransCore, Intermec has been deploying the Company's intellectual property in "the Western Hemisphere Travel Initiative, Land Border Integration, and Integrated Travel Initiative projects," all of which, in the Company's view, meet the Transportation Markets definition.[48] As further evidence of misuse, TransCore alleges Intermec's "marketing materials, including [its] websites and data sheets, fail to exclude Transportation Markets."[49]

## E. THIS LITIGATION.

### 1. Intermec's Complaint and the Company's Opposition.

Intermec sued on March 25, 2020—two days shy of the FR's three-year anniversary and almost four years since the last quarter included in the 2012–16 Reports closed.[50] Its complaint comprises two counts: (1) breach-of-contract, and (2) declaratory judgment.

Through its breach-of-contract count, Intermec seeks damages representing "the current outstanding balance . . . for the audited period" plus interest on that principal (*i.e.*, approximately $2.6 million).[51] Incorporating numerous paragraphs

---

[47] *Id.* ¶¶ 70–76.

[48] *Id.* ¶¶ 73–74.

[49] *Id.* ¶ 73.

[50] *See generally* Compl.

[51] Compl. ¶ 44.

by reference, Intermec purports to separate a breach of the Audit Provision from an independent failure by TransCore "to pay . . . ongoing royalties" (for which Intermec does not allege damages).[52]  And—in its briefs—Intermec seeks damages for TransCore's alleged refusal to prepare quarterly reports since August 2019.[53]

Intermec's declaratory count largely reasserts the issues in its breach-of-contract count.  The declaratory count seeks three[54] declarations as to TransCore's contractual duties.  Specifically, Intermec requests declarations that the Company must:  (1) pay past royalties; (2) continue paying present royalties; and (3) continue issuing quarterly reports.[55]  On all this and its breach allegations Intermec has moved for judgment on the pleadings, citing the License's plain language as support.[56]

---

[52]  *Id.* ¶¶ 41, 44–45.

[53]  Pls.' Opening Br. in Supp. of Mot. for J. on Pleadings at 12–14, Feb. 25, 2021 (D.I. 30) (hereinafter "Intermec JP Br."); *cf.* Compl., Prayer for Relief ¶ B (limiting relief based on quarterly reports to a declaration).

[54]  The Court notes Intermec's pending motion to amend its declaratory count to include a fourth declaratory request related to the License's termination.  D.I. 51.  Because Intermec's proposed amendment would have no effect on the disposition of the motions decided here, the Court does not address that requested amendment here.

[55]  Compl. ¶¶ 33–39.

[56]  Intermec JP Br. (D.I. 30).

TransCore answered. And in its answer, the Company denied almost every allegation.[57] Relevant here, it denied a duty to provide Intermec quarterly reports.[58] Later in its answer, however, the Company inserted a screenshot of the parties' quarterly report "portal" that indicates Intermec has "received" all the quarterly reports it claims are missing.[59] And, in its opposition briefs, TransCore conceded it currently has a duty to pay royalties and provide quarterly reports.[60]

Having answered and asserted counterclaims, TransCore cross-moved for judgment on the pleadings against Intermec's entire complaint. The Company contends Intermec's breach-of-contract allegations are barred by Delaware's three-year, contractual statute of limitations because, TransCore maintains, those allegations rest on royalty payments that were due five years ago.[61] And (through related briefing), TransCore continues, to the extent Intermec claims for breach of the Audit Provision, the Audit Provision does not empower the Auditor to make a "binding determination" that imposes on TransCore an unappealable duty to imburse

---

[57] Am. Ans. at Ans. ¶¶ 15–38.

[58] *Id.* at Ans. ¶ 31.

[59] *Id.* at Countercls. ¶¶ 38–39.

[60] *E.g.*, Defs.' Opening Br. in Supp. of Mot. for J. Pleadings at 19–21. Feb. 25, 2021 (D.I. 29) (hereinafter "TransCore JP Br."); Defs.' Opp'n Br. to Pls. Mot. for J. Pleadings at 13–16, Mar. 18, 2021 (D.I. 35) (hereinafter "TransCore JP Opp'n Br.").

[61] TransCore JP Br. at 7–17.

corrective payments.[62]   As to the declaratory counts, TransCore argues its concessions that it must pay royalties and provide quarterly reports should be enough to moot the underlying controversies.[63]

## 2. The Company's Counterclaims and Intermec's Opposition.

The Company levels five counterclaims comprising three contractual theories that cover two subjects: overpayment and misuse.[64]  As to overpayment, TransCore pleads breach-of-contract, breach of the implied covenant, and unjust enrichment. Using these express, implied, and quasi-contractual theories, TransCore contends, one way or another, Intermec is liable for refusing to refund the royalties the Company overpaid. As to misuse, TransCore pleads a second set of breach-of-contract and implied covenant counterclaims.  In both counts, the Company alleges Intermec's participation in the Transportation Markets violates the License.

Instead of answering, Intermec has moved to dismiss all TransCore's counterclaims under Rule 12(b)(6).[65]  Against the overpayment counts, Intermec

---

[62]   TransCore JP Opp'n Br. at 17–20.

[63]   TransCore JP Br. at 17–21.

[64]   Am. Ans. at Countercls. ¶¶ 77–113.

[65]   Pls.' Opening Br. in Supp. of Mot. to Dismiss Defs.' Countercls., Feb. 25, 2021 (D.I. 31) (hereinafter "Intermec Dismissal Br."); *see also* Defs.' Ans. Br. in Opp'n to Pls.' Mot. to Dismiss Defs.' Countercls., Mar. 18, 2021 (D.I. 36) (hereinafter "TransCore Dismissal Opp'n Br.").

argues the Company: (1) fails to plead an express breach because the License does not require Intermec to refund overpayments; (2) fails to plead a gap the implied covenant must fill and, in any event, implying the covenant would be tantamount to rewriting the License; and, (3) cannot recover on an unjust enrichment theory because the License itself governs the parties' relationship.[66] And against the misuse counts, Intermec contends: (1) the License does not prohibit Intermec from engaging all activity in the Transportation Markets, as Intermec thinks TransCore has alleged; and (2) there is no room for the implied covenant because the Transportation Markets restrictions expressly govern the breach TransCore has inadequately alleged.[67]

## II. STANDARDS OF REVIEW

### A. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM.

A party may move to dismiss under this Court's Civil Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[68] In resolving a Rule 12(b)(6) motion, the Court: (1) accepts as true all well-pleaded factual allegations in the complaint; (2) credits vague allegations if they give the opposing party notice of the claim; (3) draws all reasonable factual inferences in favor of the non-movant; and,

---

[66] Intermec Dismissal Br. at 10–18.

[67] *Id.* at 18–23.

[68] Del. Super. Ct. Civ. R. 12(b)(6).

(4) denies dismissal if recovery on the claim is reasonably conceivable.[69] The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[70] The Court will reject "every strained interpretation of the allegations proposed by the plaintiff."[71]

Delaware's pleading standard is "minimal."[72] Dismissal is inappropriate unless "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[73] As a general rule, a claim or counterclaim's reasonable conceivability cannot be determined using "matters outside the pleadings."[74] But, "for carefully limited purposes,"[75] the Court "may

---

[69] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011). This is so, and the analysis engaged is the same, whether the Court is examining an initiating plaintiff's claim or a defendant's counterclaim. *Columbus Life Ins. Co. v. Wilmington Trust Co.*, 2021 WL 537117, at *4 n.64 (Del. Super. Ct. Feb. 15, 2021).

[70] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[71] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[72] *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 895 (Del. 2002)).

[73] *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1023 (Del. Super. Ct. 2021) (internal quotation marks omitted); *see Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility. . . .'").

[74] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995).

[75] *Id.* at 69.

consider matters outside the pleadings when the document is integral to . . . a claim and incorporated into the complaint."[76]

## B. JUDGMENT ON THE PLEADINGS.

The Court cannot grant judgment on the pleadings unless, after drawing all reasonable inferences in favor of the non-moving party, no material factual dispute exists and the movant is entitled to judgment as a matter of law.[77] In resolving a Rule 12(c) motion, the Court accepts the truth of all well-pleaded facts and draws all reasonable factual inferences in favor of the non-movant.[78]

"The standard for a motion for judgment on the pleadings is almost identical to the standard for a motion to dismiss."[79] The Court thus accords the party opposing a Rule 12(c) motion the same benefits as a party defending a Rule 12(b)(6) motion.[80] Given that resemblance, the Court engages certain 12(b)(6) procedures during a

---

[76] *Windsor I, LLC v. CWCap. Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020) (internal quotation marks omitted); *see also Malpiede*, 780 A.2d at 1083 ("[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.").

[77] Del. Super. Ct. Civ. R. 12(c).

[78] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[79] *Silver Lake Off. Plaza, LLC v. Lanard & Axilbund, Inc.*, 2014 WL 595378, at *6 (Del. Super. Ct. Jan. 17, 2014) (internal quotation marks omitted).

[80] *E.g.*, *Alcoa World Alumina LLC v. Glencore Ltd.*, 2016 WL 521193, at *6 (Del. Super. Ct. Feb. 8, 2016), *aff'd sub nom.*, *Glencore Ltd. v. St. Croix Alumina, LLC*, 2016 WL 6575167 (Del. Nov. 4, 2016).

12(c) review. For example, the Court can consider, limitedly, documents outside the pleadings[81] but integral to and incorporated referentially into them.[82]

Cross-motions for judgment on the pleadings are analytically similar to cross-motions for summary judgment.[83] As a result, "where cross-motions for judgment on the pleadings are filed on a particular issue and no material facts are in dispute thereon[,] the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[84] But the mere presence of cross-dispositive motions "does not act *per se* as a concession that there is an absence of factual issues."[85] Accordingly, the Court will deny a cross Rule 12(c) motion if the cross-movant fails to show no material factual issue exists.[86]

---

[81] *See Jiménez v. Palacios*, 250 A.3d 814, 827 (Del. Ch. 2019) ("The pleadings to which this Court may look [on Rule 12(c) review] are not limited to complaints or counterclaims, but also include answers and affirmative defenses."), *aff'd*, 2020 WL 4207625 (Del. July 22, 2020).

[82] *See McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000) ("In analyzing a motion to dismiss, the court may consider, for carefully limited purposes, documents integral to or incorporated into the complaint by reference. The same standard logically applies on a Rule 12(c) motion as well." (citation omitted)).

[83] *E.g.*, *Silver Lake*, 2014 WL 595378, at *6; *see generally* Del. Super. Ct. Civ. R. 56(h).

[84] *Indian Harbor Ins. Co. v. SharkNinja Operating LLC*, 2020 WL 6795965, at *3 (Del. Super. Ct. Nov. 19, 2020) (internal quotation marks and citation omitted); *see also V&M Aerospace LLC v. V&M Co.*, 2019 WL 3238920, at *3–4 (Del. Super. Ct. July 18, 2019) (concluding that the difference between judgment on the pleadings standard and the summary judgment standard was "immaterial" because a "question of law" alone was involved).

[85] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

[86] Del. Super. Ct. Civ. R. 12(c).

## III. DISCUSSION

The parties' motions require the Court to interpret the License. Delaware law governs the License,[87] and in Delaware, a contract's proper construction is a question of law.[88] The goal of contract interpretation "is to fulfill the parties' expectations at the time they contracted."[89] To that end, the Court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[90] In all this, "clear and unambiguous terms" must be accorded "their ordinary meaning."[91] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[92]

"A court must accept and apply the plain meaning of an unambiguous term . . . in the contract language . . ., insofar as the parties would have agreed *ex ante*."[93] "Absent some ambiguity, Delaware courts will not destroy or twist [contract]

---

[87] License § X2-6.3.

[88] *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017).

[89] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted).

[90] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[91] *Leaf Invenergy*, 210 A.3d at 696 (internal quotation marks omitted).

[92] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[93] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

language under the guise of construing it."[94] But a contract "is not ambiguous simply because the parties disagree on its meaning."[95] No, ambiguity exists only if disputed contract language "is fairly or reasonably susceptible of more than one meaning."[96]

As a question of law, a contract's proper interpretation can be resolved on a pleadings-stage motion.[97] But, at the pleadings stage, the movant must show the terms supporting its motion are indeed unambiguous.[98] At the pleadings stage of a contract dispute, the Court "cannot choose between two differing reasonable interpretations of ambiguous" contract language.[99] So, to succeed, the movant's

---

[94] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[95] *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997); *see Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 n.68 (Del. 2019) (explaining that, because a contract's meaning is a question of law, a court, not the parties, must decide whether the contract is ambiguous or not); *cf. Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1231 (Del. 1997) ("We are not bound, and the trial court was not bound, by the parties' present claim that the provision is unambiguous.").

[96] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[97] *See, e.g.*, *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) ("Under Delaware law, the proper interpretation of language in a contract is a question of law. Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language."); *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *12 (Del. Super. Ct. July 29, 2021) ("'[J]udgment on the pleadings is a proper framework for enforcing unambiguous contracts,' which only have one reasonable meaning and therefore do not create 'material disputes of fact.'" (alteration in original) (quoting *Lillis v. AT & T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006))).

[98] *E.g.*, *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003); *see also GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) ("[W]here two reasonable minds can differ as to the contract's meaning, a factual dispute results. . . . In those cases, [judgment as a matter of law] is improper." (citations omitted)).

[99] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996); *see also Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1292 (Del.

-23-

interpretation must be "the *only* reasonable construction as a matter of law."[100]

Otherwise, "for purposes of deciding" the motion, the language must be resolved in

the non-movant's favor.[101]

## A. TRANSCORE'S BREACH-OF-CONTRACT COUNT FOR OVERPAYMENT FAILS TO STATE A CLAIM.

To state a breach-of-contract claim, a claimant must allege: "(1) the existence

of a contractual obligation; (2) a breach of that obligation; and (3) damages resulting

from the breach."[102]   The complaint supports a reasonable inference that TransCore,

at times, overpaid Intermec.  But this counterclaim still fails.  The Company hasn't

pleaded an express contractual obligation requiring Intermec to refund the surplus.

---

2007) ("Even if [the] Court consider[s] the [movant's] interpretation more reasonable than the [non-movant's], on a Rule 12(b)(6) motion it [is] error to select the 'more reasonable' interpretation as legally controlling.").

[100]  *VLIW Tech.*, 840 A.2d at 615; *see also Khushaim v. Tullow Inc.*, 2016 WL 3594752, at *3 (Del. Super. Ct. June 27, 2016) ("[W]hen parties present differing—but reasonable—interpretations of a contract term, the Court must examine extrinsic evidence to discern the parties' agreement; such an inquiry cannot proceed on a motion to dismiss." (alteration and internal quotation marks omitted)).

[101]  *VLIW Tech.*, 840 A.2d at 615; *see CRE Niagara Holdings, LLC v. Resorts Grp., Inc.*, 2021 WL 1292792, at *10 (Del. Super. Ct. Apr. 7, 2021) ("Faced with a question of contract interpretation on a motion to dismiss, the Court must determine whether the contractual language is unambiguous.  If so, the Court must give effect to its meaning.  If, however, the contractual language is [ambiguous], the Court must resolve the ambiguity in favor of the non-moving party." (alterations and internal quotation marks omitted)); *see also Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *8 (Del. Ch. Sept. 18, 2014) ("At the motion to dismiss stage, ambiguous contract provisions must be interpreted most favorably to the non-moving party.").

[102]  *Buck v. Viking Holding Mgmt. Co. LLC*, 2021 WL 673459, at *3 (Del. Super. Ct. Feb. 22, 2021).

Citing the Payment Provision, TransCore alleges the License imposes an obligation on Intermec to return payments that exceed that Provision's fixed percentages. But the Payment Provision unambiguously applies to TransCore, not Intermec, and so does not mention refunds at all. Indeed, the fixed royalty percentages, when read naturally, dictate how much TransCore must pay, proscribing anything *less*. They do not, conversely, address a situation in which TransCore pays *more*. By consequence, the License's plain language does not expressly require Intermec to refund TransCore's overpayments or to ensure TransCore hasn't overpaid. To the contrary, the Payment Provision simply affords Intermec recourse when TransCore underpays. It is not reasonably conceivable that a provision specifying precisely how much a payor must pay also silently compels the payee to inform the payor whenever it inadvertently forwards extra funds.

The Company resists this conclusion by faulting Intermec for not citing a case in which a court held "a contract must expressly provide for return of overpayments to create an action for breach if a party accepts more than the stated amount owed."[103] Ironically, the Company didn't cite a case holding the opposite.

But no matter. "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of

---

[103] TransCore Dismissal Opp'n Br. at 14.

either party would have no expectations inconsistent with the contract language."[104]

And here, no reasonable person would expect a provision that governs payments also, without saying, imposes obligations to issue refunds.[105] TransCore, a sophisticated counterparty, did not obtain an express term addressing overpayments at the bargaining table.[106] It cannot now use litigation and the Court to rewrite the deal.[107]

TransCore's breach-of-contract counterclaim for overpayment fails to plead a recognizable contractual obligation. Accordingly, Intermec's motion against this counterclaim for failure to state a claim is **GRANTED**.

---

[104] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted).

[105] *See Active Asset Recovery, Inc. v. Real Est. Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (finding that omission of a specific term in a contract "speaks volumes" about the parties' intent when construing included terms); *see also Fortis Advisors LLC v. Shire US Holdings, Inc.*, 2017 WL 3420751, at *8 (Del. Ch. Aug. 9, 2017) (analogizing counterparties' omission of specific terms to the statutory canon of *expresio unius est exclusio alterius*, which provides that an omission presumptively is intentional when other terms are included instead).

[106] *But see W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 2009 WL 4154356 (Del. Nov. 24, 2009).

[107] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 624 (Del. Ch. 2005), *aff'd in part, rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006) ("It is not the court's role to rewrite the contract between sophisticated market participants, allocating the risk of an agreement after the fact, to suit the court's sense of equity or fairness."); *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006) ("[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not. Rather, it is the court's job to enforce the clear terms of contracts.").

## B. TransCore's Implied Covenant Count for Overpayment States a Claim.

The Company has failed to plead an express contractual obligation requiring Intermec to refund overpaid royalties. Suspecting this, TransCore alternatively has alleged the License contains a gap the Court should fill with the implied covenant. Specifically, TransCore contends the License's purpose, which is to permit TransCore's sale of Licensed Products—*i.e.*, components that "would infringe" Intermec Licensed Patents "but for" the License—would be frustrated if Intermec could, as well, collect (or refuse to refund) royalties where the Company would *not* infringe those Patents—*i.e.*, sales involving expired Intermec Licensed Patents or sales not involving Intermec's intellectual property at all. It is reasonably conceivable that, had the parties considered this issue at the time of contracting, they would have agreed that neither has a duty to pay for Licensed Products that are not or no longer Licensed Products. TransCore's implied covenant counterclaim for overpayment accordingly stands.

### 1. It is Reasonably Conceivable that Intermec Breached an Implied Covenant.

"To state a claim for breach of the implied covenant, a claimant must allege: (1) a specific implied contractual obligation; (2) a breach of that obligation; and

-27-

(3) resulting damage."[108] The implied covenant of good faith and fair dealing inheres in all contracts and exists to fill unanticipated gaps in a contract's express terms.[109] It "preserve[s] the economic expectations of the parties" by "ensur[ing] that the parties deal honestly and fairly with each other when addressing" unexpected contractual developments.[110] Put differently, the implied covenant prevents a contracting party from acting "arbitrarily and unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[111] Implying the covenant, then, is an "occasional necessity . . . to ensure the parties' reasonable expectations are fulfilled."[112] Those "reasonable expectations . . . are assessed at the

[108] *KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at \*26 (Del. Super. Ct. June 24, 2021) (internal quotation marks omitted).

[109] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017).

[110] *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021) (citation omitted).

[111] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[112] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation marks omitted).

time of contracting."[113] So the Court "looks to the past"[114] and asks "what the parties likely would have done if they had considered the issues involved."[115]

The implied covenant tries to "honor[] the reasonable expectations created by autonomous *expressions* of the contracting parties."[116] It "thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer."[117] At the pleadings stage, then, the claimant "must allege facts suggesting 'from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith . . . had they thought to negotiate with respect to that matter.'"[118] That is because "an obligation may be

[113] *Dieckman*, 155 A.3d at 367; *see Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013) ("[W]hat is arbitrary or unreasonable—or conversely[,] reasonable—depends on the parties' original contractual expectations." (internal quotation marks omitted)), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013).

[114] *Gerber*, 67 A.3d at 419.

[115] *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) (internal quotation marks omitted).

[116] *E.I. du Pont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996) (emphasis added) (internal quotation marks omitted).

[117] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

[118] *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2019 WL 4927053, at *22 (Del. Ch. Oct. 7, 2019) (ellipsis in original) (quoting *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

inferred when, given the terms of the express contract . . ., it is more likely than not

. . . that if the parties *had* thought to address the subject, they would have agreed to

create [the] obligation that is under consideration . . . *ex post facto*."[119]

Given that "parties occasionally have understandings or expectations so

fundamental that they did not need to negotiate about those expectations,"[120]

Delaware law views the implied covenant as "well-suited" for supplying

"contractual terms that are so obvious . . . that the [parties] would not have needed

to include [them] as express terms in the agreement."[121] After all, "[w]hen a contract

contemplates . . . an on-going relationship . . . the cost of attempting to catalog and

negotiate with respect to all possible future states of the world would be prohibitive,

if it were cognitively possible. In such contracts[,] some things must be left to the

good faith of the parties."[122] "No contract, regardless of how tightly or precisely

drafted, can wholly account for every possible contingency."[123]

---

[119] *Schwartzberg v. CRITEF Assocs. Ltd. P'ship*, 685 A.2d 365, 376 (Del. Ch. 1996).

[120] *Katz*, 508 A.2d at 880 (internal quotation marks omitted).

[121] *Dieckman*, 155 A.3d at 361; *accord Glaxo Grp.*, 248 A.3d at 919 n.35.

[122] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *26 (Del. Ch. Dec. 30, 1991) (citation omitted); *see Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (observing that even the most skilled and sophisticated parties necessarily will "fail to address to address a future state of the world . . . because contracting is costly and the human mind is imperfect").

[123] *Glaxo Grp.*, 248 A.3d at 919 (internal quotation marks omitted).

Wielding the implied covenant is a "cautious enterprise."[124] Under Delaware law, sophisticated parties are presumptively "bound by the [express] terms of their agreement" because "[h]olding [them] to their agreement promotes certainty and predictability in commercial transactions."[125] So "[i]mplying a term that the parties did not expressly include risks upsetting the economic balance of rights and obligations that the contracting parties bargained for in their agreement."[126] Indeed, the implied covenant "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affect[] one party to a contract."[127] As a result, implying the covenant should be "a rare and fact-intensive exercise, governed solely by issues of compelling fairness."[128] The Court, then, won't "re-write" the agreement's express terms in the guise of implying a covenant.[129] Nor will the Court fill a gap by "introduc[ing] its

---

[124] *Nemec*, 991 A.2d at 1125.

[125] *Glaxo Grp.*, 248 A.3d at 919.

[126] *Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 350 (Del. 2020).

[127] *Oxbow Carbon & Min. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (internal quotation marks omitted); *see also Nemec*, 991 A.2d at 1126 ("Parties have a right to enter into good and bad contracts, the law enforces both."); *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004) (observing that the implied covenant cannot be deployed to extract terms a party "failed to secure . . . at the bargaining table").

[128] *Dunlap*, 878 A.2d at 442 (alteration and internal quotation marks omitted).

[129] *Oxbow*, 202 A.3d at 507 (internal quotation marks omitted); *see also Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015) (The implied covenant "does not apply when the contract addresses the conduct at issue."); *Nemec*, 991 A.2d at

own notions of what would be fair or reasonable under the circumstances."[130] Instead, "when the contract is truly silent on the matter at hand,"[131] the Court will "enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them."[132]

The License's purpose at the time of contracting was to neutralize infringement claims so the parties could innovate RFID. In exchange for an infringement disclaimer, the Company agreed to pay Intermec royalties on revenue generated by Licensed Products transactions. Further centralizing the infringement disclaimer, Licensed Products are defined as RFID components that, "but for" the License, "would infringe" Intermec Licensed Patents.[133] By defining Licensed

---

1125–26 ("[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement." (alteration in original) (quoting *Dunlap*, 878 A.2d at 441)).

[130] *Allen*, 113 A.3d at 184; *see also id.* at 182–83 (The implied covenant "does not establish a free-floating duty that a party act in some morally commendable sense.").

[131] *Oxbow*, 202 A.3d at 507 (internal quotation marks omitted).

[132] *Gerber*, 67 A.3d at 419 (internal quotation marks omitted); *see Dunlap*, 878 A.2d at 441 ("[I]mplied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal document." (cleaned up)); *see ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–42 (Del. Ch. 2012) (explaining that the implied covenant has a "retrospective focus" and so is not about "what duty the law should impose . . . at the time of the wrong," but rather concerns "the parties' original contractual expectations" (citations omitted)), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013); *see also Allen*, 113 A.3d at 183 ("If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled.").

[133] License § X1-1.8.

Products, in part, based on Intermec's ownership rights, the parties plainly understood that TransCore is obliged to pay royalties only on what would, but for the License, amount to infringement of Intermec Licensed Patents. After all, a Licensed Product that would *not* infringe a Licensed Patent is *not* a Licensed Product. And an expired Licensed Patent is not a Licensed Patent anymore.

Based on the License's purpose at the time of contracting, it is reasonable to infer, at the pleadings stage, the parties reasonably expected TransCore wouldn't pay Intermec for intellectual property that TransCore doesn't use. It is likewise reasonable to infer the parties reasonably expected the Company wouldn't pay for Licensed Patents that, "upon . . . expiration,"[134] Intermec couldn't enforce through infringement litigation or through Licensed-based claims.

---

[134] *Id.* at Recitals. Though recitals "do not ordinarily form any part of the real agreement," *TA Operating, Inc. v. Comdata, Inc.*, 2017 WL 3981138, at *23 (Del. Ch. Sept. 11, 2017) (internal quotation marks omitted), this part of the recitals does form part of the License because it defines the word "Term," which is used throughout the License, *cf. Star Cellular Tel. Co., Inc. v. Baton Rouge CGSA, Inc.*, 1993 WL 294847, at *5 (Del. Ch. Aug. 2, 1993) (reviewing recitals to glean intent on meaning of undefined term). Regardless, recitals have been regarded as an "obvious source for gaining contractual intent . . . because it is there that the parties expressed their purposes for executing the" contract. *Citadel Holding Co. v. Roven*, 603 A.2d 818, 822–23 (Del. 1992); *see Urdan v. WR Cap. Partners, LLC*, 2019 WL 3891720, at *15 (Del. Ch. Aug. 19, 2019) (noting that recitals "provide background and can offer insight into the intent of the parties"), *aff'd*, 243 A.3d 668 (Del. 2020). As a result, recitals might be relied upon the agreement's express terms do not conclusively establish the parties' intent. *E.g.*, *Llamas v. Titus*, 2019 WL 2505374, at *16 (Del. Ch. June 18, 2019). Given that the implied covenant requires the Court to focus retrospectively on what the parties would have done at the time of contracting if they had encountered the issue *sub judice*, the recitals are probative of the parties' thirteen-year-old intent.

It is similarly reasonable to infer, at this stage, that the parties did not think to draft express language addressing this issue because it was "so obvious" that the License would not regulate patents the parties do not own and so can no longer protect.[135] Relatedly, the complaint supports a reasonable inference that the Company would not have entered the License if it would be required to pay for intellectual property Intermec does not have an interest in. There is no need to contract for an infringement disclaimer if there is nothing to infringe.

Taken together, it is reasonably conceivable that there is an implied term in the License precluding Intermec from charging (by refusing to refund), with impunity, royalties on transactions that would not infringe Intermec Licensed Patents. Accordingly, it is reasonably conceivable that this gap should be filled.

The Company also has pleaded a reasonably conceivable breach of that implied term. To reiterate, the License allows the parties to "infringe" each other's Licensed Patents. But the pleadings thus far support a reasonable inference that TransCore, on some occasions, overpaid by remitting royalties on non-infringing transactions. At the pleadings stage, then, it is reasonable to infer Intermec has acted arbitrarily or unreasonably when withholding payments for intellectual property it doesn't own. Such conduct might have the effect of frustrating the Company's reasonable expectations at the time of contracting, *e.g.*, to benefit from intellectual

---

[135] *Dieckman*, 155 A.3d at 361; *accord Glaxo Grp.*, 248 A.3d at 919 n.35.

property rights that Intermec actually possesses. Accordingly, if discovery establishes the parties would have agreed, at the time of contracting, that there is no duty to pay for invalid or unused Licensed Patents, then Intermec will have breached an implied covenant in the License by refusing to disgorge the excess.

The implied covenant counterclaim for overpayment survives dismissal. Intermec's motion against this count is **DENIED**.

Having just finished arguing there is no express term in the License prohibiting it from retaining overpayments, Intermec now argues there is no implied term requiring it to issue a refund either. To Intermec, because the License allows the Company to calculate its own royalty payments, there is no gap—TransCore just should have checked the Licensed Patents schedules and it wouldn't have overpaid.[136] But this conflates separate inquiries: whether an implied covenant exists and whether a claimant can recover on its breach. That TransCore "voluntarily" made payments it was not liable for might support an implied covenant breach defense,[137] depending on the precise way the gap might be filled.[138] But the

---

[136] Intermec Dismissal Br. at 17–18.

[137] *See infra.* Part IV. Section B.2.

[138] *See Allen*, 113 A.3d at 184 ("Assuming a gap exists and the court determines that it should be filled, the court must determine how to fill it. . . . Terms are to be implied in a contract not because they are reasonable but because they are necessarily involved in the contractual relationship so that the parties must have intended them[.]" (internal quotation marks omitted)).

Company's actions at the time of the alleged wrong are not relevant to the question of whether an implied term existed at the time of contracting.[139] In fact, Intermec's defense-based analysis seems to presuppose that a gap, and a breach of a term that might end up filling it, are, at minimum, reasonably conceivable.

Yet, Intermec discounts that its position turns on an implied term as well. By arguing the License does not impose a *duty* to issue a refund, Intermec concludes it does have a *right* to keep overpayments. Aside from being logically unsound, Intermec's conclusion ignores that the License does not speak to overpayments, let alone rights to them. If anything, Intermec's insupportable finders-keepers rationale furthers the credible inference that it would be arbitrary or unreasonable for Intermec to retain "royalties" on assets it doesn't own.

As another dispositive basis for denying Intermec's motion, Intermec's reading of the Payment Provision is not reasonable. The Payment Provision prescribes the percentages of royalties due on Licensed Products' Net Sales Value. Its language does not clearly govern what happens to "royalties" paid on "Net Sales Value" not covered by the License. It may be the case, as Intermec suggests, that by not specifying procedures for reconciling over- or mistaken payments, the parties intended the risk of loss to fall on TransCore. But, at the pleadings stage, it is

---

[139] *See, e.g., Gerber*, 67 A.3d at 419 (holding that the existence of an implied covenant "depends on the parties' original contractual expectations, not a free-floating duty applied at the time of the wrong" (internal quotation marks omitted)).

-36-

reasonably conceivable that the parties just did not think to address the issue but would have drafted a provision specifying how to address it if they had.

**2. The Company's "Voluntary Payments" Involve a Factual Issue.**

To lay the cornerstone for a future affirmative defense, Intermec invokes the "voluntary payment doctrine."[140] The voluntary payment doctrine bars recovery of "payment voluntarily made with full knowledge of the facts . . . ."[141] It prevents a counterparty from claiming that a "misapprehension of . . . [its] legal rights and obligations" caused it to make payments by mistake.[142] Conceptually, the voluntary payment doctrine derives from the intellection that ignorance of the law is no

---

[140] The voluntary payment doctrine evolved from unjust enrichment law. *See generally Home Ins. Co. v. Honaker*, 480 A.2d 652, 652–54 (Del. 1984). Given unjust enrichment's equitable underpinnings, and that the doctrine concerns restitution, it seems to make the most analytical sense in that context too. *See W. Nat. Gas Co. v. Cities Serv. Gas Co.*, 201 A.2d 164, 169 (Del. 1964) (noting an "absence of a contract to repay" when pronouncing the doctrine).

Nonetheless, this Court has observed that restitution, though based on "equitable considerations," can be ordered in a "law court[]" and "in the form of a money judgment." *Rufus v. Ramsey*, 2004 WL 838612, at *2 (Del. Super. Ct. Apr. 13, 2004). As a result, this Court has considered the doctrine as a defense to non-unjust enrichment claims, including breach-of-contract claims. *See Winshall v. Viacom Int'l, Inc.*, 2019 WL 960213, at *15 (Del. Super. Ct. Feb. 25, 2019); *Nieves v. All Star Title, Inc.*, 2010 WL 2977966, at *6–8 (Del. Super. Ct. July 27, 2010). The Restatement of Restitution & Unjust Enrichment, in comments, also discusses the doctrine's effect on settlements, and separately analogizes to loss-allocation devices through which contract parties assume risk of mistaken payments. RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 6 cmts. d, e & illus. 18–19 (AM. L. INST. 2011). And the parties, too, have argued it outside the unjust enrichment count. Intermec Dismissal Br. at 13–16; TransCore Dismissal Opp'n Br. at 15–17. So the Court considers it here.

[141] *W. Nat. Gas*, 201 A.2d at 169.

[142] *Winshall*, 2019 WL 960213, at *15 (internal quotation marks omitted).

-37-

excuse.[143] A contract party who pays its counterparty even though it had no contractual (legal) duty to do so may be found to have waived an argument in favor of recovering those payments.[144]

But the voluntary payment doctrine's negative treatment of mistakes of law does not reach all mistakes. When "money [is] paid under a mistake of fact," even if the mistake is unilateral, the errant payment may be excused and recovery possible.[145] In deciding whether the mistake is one of law or fact, courts look to the totality of the circumstances, considering "the circumstances under which [the payment] was made, the conduct of the payee and payor, and any other factors bearing on whether it would be unjust to permit the retention of the benefit or to order its restitution."[146] The payor bears the burden of demonstrating its payments, though negligently made, nevertheless were the result of an excusable mistake of fact.[147]

---

[143] *See Honaker*, 480 A.2d at 653 ("As a general rule, money paid due to a mistake of law is not recoverable. . . .").

[144] *See id.* at 654 (noting approvingly that "errant construction of a contract's terms" would preclude recovery as a "mistake of law").

[145] *See id.* at 653–54.

[146] *Id.* at 654.

[147] *Id.*

At this stage, the complaint itself supports a reasonable inference that TransCore made a factual mistake.  The License lists several hundred Intermec Licensed Patents.   They had been registered at varied times and so were bound to expire at varying rates.[148]  Given the volume, and lapse differential, the margin for error seems high.  There also appears to be no express duty to surveil the expiration dates.   It is reasonably conceivable, then, that the Company might mistakenly pay for an expired Licensed Patent or a non-infringing transaction unless TransCore had factual knowledge that a particular Licensed Patent or Product is no longer royalty-bearing.

To be sure, the Company's alleged belt-and-suspenders approach to computing Net Sales Value very well may be found, later in the case, to have been ill-conceived.  It is possible that its errors are legal mistakes about how to interpret its payment duties and calculation rights.  But at this pleadings stage, the Court has none of the circumstances that might endue a review of the totality.  The instant record is just too undeveloped to find TransCore unequivocally made a mistake of law.

To repel a fact-intensive analysis, Intermec swings a categorical rule.   In Intermec's view, TransCore's equal access to the Licensed Patent schedules

---

[148] *See* License at Attachs. 3, 4 (Schedules of Royalty-Bearing Patents).

precludes, as a matter of law, the Company from arguing it lacked complete knowledge of which Licensed Patents and Products required payment, and which did not. But "[t]he negligence of the payor in mistakenly compensating the payee, alone, is no bar to [recovery] of the sum paid."[149] And "no Delaware court has imposed [the voluntary payment] doctrine as a bar to recovery on the basis of constructive, rather than actual, knowledge."[150] The inquiry looks to the totality of the circumstances and so cannot be resolved on this limited record. Accordingly, Intermec's voluntary payment defense must be rejected for now.

## C. TRANSCORE'S UNJUST ENRICHMENT COUNT FOR OVERPAYMENT FAILS TO STATE A CLAIM.

As a third basis for overpayment relief, TransCore pleads unjust enrichment. Unjust enrichment, though, is available only in "the absence of a formal contract."[151] So "unjust enrichment claims that are premised on an express, enforceable contract" fail to state a claim.[152] Here, the Company seeks—and may obtain—recovery under

---

[149] *Honaker*, 480 A.2d at 654.

[150] *Envolve Pharm. Sols., Inc. v. Rite Aid Hdqtrs. Corp.*, 2021 WL 140919, at *11 (Del. Super. Ct. Jan. 15, 2021); *see also* RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 6 cmt. e (cautioning that when the voluntary payment doctrine is applied to "a business setting," it should not be applied to "imput[e] knowledge" of which the payor "is not in fact aware," as doing so would not be "realistic").

[151] *ID Biomed. Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995); *see also Windsor I*, 238 A.3d at 875 (enumerating unjust enrichment elements, one of which being "the absence of a remedy provided by law" (internal quotation marks omitted)).

[152] *Stone & Paper Invs., LLC v. Blanch*, 2020 WL 3496694, at *12 (Del. Ch. June 29, 2020) (internal quotation marks omitted); *see Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del.

the License.  Accordingly, the Company fails to state an unjust enrichment claim.

Intermec's motion against this count is **GRANTED**.

The Company opposes this straightforward conclusion by advancing a few unpersuasive arguments.  First, TransCore contends the rule requiring dismissal of unjust enrichment claims that overlap contract-based claims applies only in the Court of Chancery.[153]  Not so.  Under Delaware law—which applies in this Court too—"[i]f recovery is possible under the contract," then the contract controls and a duplicative unjust enrichment claim will be dismissed as an attempt to obtain double recovery.[154]

---

1979) ("Because the contract is the measure of the plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it."); *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *18 (Del. Ch. June 11, 2020) ("[U]njust enrichment claims generally will be dismissed as duplicative when there is an enforceable contract that governs a relationship."); *see also Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012) ("It is a well-settled principle under Delaware law that a party cannot recover under a theory of unjust enrichment if a contract governs the relationship . . . *that gives rise* to the unjust enrichment claim." (emphasis added)); *see generally* RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 2 ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.").

[153] TransCore Dismissal Opp'n Br. at 9–10.  The Company argues the "underlying logic of the decisions" it cites is that an unjust enrichment theory is always transformed into a "legal claim" whenever pleaded as an alternative to a breach-of-contract claim.  *Id.* at 9.  The Company's position is contradicted by Delaware law.  As at least one of those cases recognized, whether an unjust enrichment claim is a "legal claim" and so outside equitable jurisdiction depends on the allegations pleaded in the breach-of-contract count and whether the most appropriate relief is legal, not equitable, in character.  *See Dickerson v. Vills. of Five Points Prop. Owners Ass'n, Inc.*, 2020 WL 7251512, at *5 (Del. Ch. Dec. 9, 2020) ("For example, if the unjust enrichment serves as an alternate theory of recovery for a contract claim, and *money damages will make the plaintiff whole*, it is a legal claim." (emphasis added) (internal quotation marks omitted)).  There is no *per se* rule.

[154] *Envolve Pharm.*, 2021 WL 140919, at *10.

Next, the Company insists alternative pleading rules allow it to plead an unjust enrichment claim alongside a breach-of-contract claim. It is true that, at the pleadings stage, the mere existence of a breach-of-contract claim won't automatically foreclose pursuit of an unjust enrichment claim.[155] So in some instances, Delaware law does permit unjust enrichment claims to cohabit complaints with breach-of-contract ones as alternative theories for recovery.[156] Those circumstances are limited to situations where "there is doubt surrounding [the relevant contract's] enforceability or . . . existence."[157] But the Company has not alleged here that the License never existed, has been lost, or should be deemed unenforceable. To the contrary, it repeatedly urges, throughout its briefing, that the License's existence and validity are not in dispute.[158]

Dauntless, the Company says because its express breach-of-contract claim might fail, its unjust enrichment claim is a permissible safety net. But just because an enforceable contract may not provide the relief a litigant wants does not mean its

---

[155] *S'holder Rep. Servs. LLC v. RSI Holdco, LLC*, 2019 WL 2207452, at *6 (Del. Ch. May 22, 2019) (cleaned up).

[156] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *8 (Del. Ch. Feb. 3, 2009).

[157] *Khushaim*, 2016 WL 3594752, at *8 (internal quotation marks omitted).

[158] *E.g.*, Defs.' Reply Br. in Supp. of Mot. for J. on Pleadings at 2 & n.3, Apr. 1, 2021 (D.I. 42) (hereinafter "TransCore JP Reply").

case is "not controlled by the contract."[159] Courts finding otherwise considered facts that were not covered, expressly or impliedly, by the subject agreement.[160] At bottom, an unjust enrichment claim cannot be used to circumvent an inadequate breach-of-contract claim.[161] And TransCore's attempts to do so fail.

Finally, and slightly differently, the Company insists, "to the extent" the License is silent on overpayments, the License does not govern its relationship with Intermec and so it needs an unjust enrichment theory to recover.[162] The Company forgets its implied covenant theory. "Notwithstanding the covenant's potentially misleading moniker . . ., a claim for breach of the implied covenant is a contract claim, requires proof of breach-of-contract elements, and yields contract remedies."[163] So "[i]f the alleged wrongs underlying [an] unjust enrichment claim

[159] *S'holder Rep. Servs.*, 2019 WL 2207452, at *6 (internal quotation marks omitted).

[160] *See, e.g.*, *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2021 WL 2588905, at *15 (Del. Ch. June 14, 2021) (allowing unjust enrichment count to proceed alongside breach-of-contract count where side agreement on which unjust enrichment had been based may never have been executed and was not in the record); *Avantix Labs., Inc. v. Pharmion, LLC*, 2012 WL 2309981, at *9 (Del. Super. Ct. June 18, 2012) (observing that unjust enrichment claims will not be dismissed where the breach is based on a "claim not governed exclusively by the contract at issue" and holding an unjust enrichment claim could proceed alongside breach-of-contract claims because some alleged services on which unjust enrichment was based were not "addresse[d]" by the subject contract's scope).

[161] *E.g.*, *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

[162] Am. Ans. at Countercls. ¶ 81.

[163] *ASB Allegiance*, 50 A.3d at 444–45.

relate[] solely to the same allegations as . . . [a well-pleaded] implied covenant claim[],'' the unjust enrichment claim will be dismissed.[164] Here, the Court has ruled the License conceivably contains an implied covenant that regulates overpayments. That means the License "governs the relevant relationship between the parties" and "provide[s] the measure of [TransCore's] rights."[165] To be sure, TransCore may lose. But the "possibility" that it won't is all that matters.[166]

As the master of its own complaint,[167] TransCore chose to plead two breach-of-contract claims on top of an unjust enrichment theory without changing the allegations supporting each. It thus ran the risk that one of the License-based counts would preclude unjust enrichment relief. One did. Because the implied covenant count tees up a possible contractual right under the License—an inarguably valid and living agreement—the unjust enrichment count is duplicative and dismissed.

---

[164] *CMS Inv. Holdings, Inc. v. Castle*, 2015 WL 3894021, at *17 (Del. Ch. June 23, 2015).

[165] *Stone & Paper*, 2020 WL 3496694, at *12; *see S'holder Rep. Servs.*, 2019 WL 2207452, at *6 ("Where a plaintiff pleads a right to recovery *not controlled by contract. . .*, courts will permit unjust enrichment claims to proceed." (emphasis added) (alterations and internal quotation marks omitted)).

[166] *Envolve Pharm.*, 2021 WL 140919, at *10; *see, e.g.*, *Pallisades Collection, LLC v. Unifund CCR Partners*, 2015 WL 6693962, at *8 (Del. Super. Ct. Nov. 3, 2015) ("The [claimants] should be able to be made whole through a breach[-]of[-]contract claim *if* [they] can factually demonstrate a breach. . . .").

[167] *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *9 (Del. Super. Ct. Jan. 13, 2021) (internal quotation marks omitted).

**D. TRANSCORE'S EXPRESS BREACH-OF-CONTRACT COUNT FOR MISUSE STATES A CLAIM, BUT ITS IMPLIED COVENANT COUNT FOR MISUSE DOESN'T.**

Last, the Court turns to TransCore's misuse allegations. According to the Company, Intermec has been using Company Licensed Patents, Products, or both, in the Transportation Markets, breaching the License along the way. Intermec counters: (1) the License does not, expressly or impliedly, prohibit it from operating in the Transportation Markets; (2)(i) TransCores's charges are really patent infringement claims over which this Court lacks subject matter jurisdiction; and (2)(ii) if the License prohibits all commercial activity in the Transportation Markets, then it is illegal under antitrust law as a horizontal restraint of trade. Given Intermec's reasoning, the issue is not whether TransCore's misuse allegations are reasonably conceivable, but rather, whether it is reasonably conceivable that the License's express terms cover Intermec's alleged misconduct. As explained below, it is reasonably conceivable that the License's express terms do. Necessarily, then, the Company has failed to state an implied covenant claim for misuse.

**1. This is a Breach-of-Contract Claim, Not a Patent Infringement Claim.**

The Company's allegations sound in patent violations. So Intermec tries to make a federal case out of it. According to Intermec, this claim, when reduced, concerns patent infringement, stripping this Court of jurisdiction to hear it. When properly understood, though, the subject of the agreement may be patents, but the claim is for breach-of-contract.

By creating federal courts, Congress "intended division of labor."[168] On their side of the ledger, federal courts have original jurisdiction over cases "arising under" federal law[169] and exclusive jurisdiction over patent cases.[170] In this context, then, "[t]he question [of] whether a claim arises under the patent laws is similar to the question [of] whether a claim arises under federal law."[171] So to determine whether a claim arises under patent, and therefore federal, law, the Court must start with the "creation test."[172] If federal patent law "creates the cause of action asserted,"[173] a state court lacks jurisdiction to resolve the claim.

A common law breach-of-contract claim "finds its origins" in state law, making state, not federal, law its creator.[174] Nevertheless, the United States Supreme Court has recognized "a special and small category" of claims that—despite their state origins—involve "such . . . serious federal interest[s]" as to be deemed federally-created.[175] *Gunn v. Minton* explains: "federal jurisdiction over a state law

---

[168] *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 319 (2005).

[169] 18 U.S.C § 1331 (1980).

[170] 28 U.S.C. § 1338(a) (2011).

[171] *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 821 (1988).

[172] *Gunn v. Minton*, 568 U.S. 251, 257 (2013) (internal quotation marks omitted).

[173] *Merrill, Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1569 (2016).

[174] *Gunn*, 568 U.S. at 258.

[175] *Id.* (internal quotation marks omitted).

claim will lie if a federal issue is: [(i)] necessarily raised, [(ii)] actually disputed, [(iii)] substantial, and [(iv)] capable of resolution in federal court without disrupting the federal-state balance approved by Congress."[176]  The test is conjunctive[177] and a finding of federal jurisdiction thereunder, "rare."[178]  Indeed, "the mere presence of a federal issue in a state cause of action does not automatically confer federal jurisdiction."[179]

Taking all this together, the Court must decide whether this breach-of-contract claim fits within the "exemplary" and slim minority of state-based claims that raise the "significant federal issues" to which *Gunn* alludes.[180]  It doesn't.  Intermec's argument falters on *Gunn*'s first element, relieving the Court of the rest.

"A federal issue is 'necessarily raised' by a claim if the court must address the issue in order to resolve the claim."[181]  But here, the Court can eschew federal law entirely.  To determine whether TransCore has stated a breach of the License's

---

[176]  568 U.S. 251, 258.

[177]  *See id.* ("Where all four of these requirements are met, . . . [federal] jurisdiction is proper. . . .").

[178]  *Sanyo Elec. Co., Ltd. v. Intel Corp.*, 2019 WL 1650067, at *4 (D. Del. Apr. 17, 2019) (citing *Manning v. Merrill Lynch Fenner & Smith Inc.*, 772 F.3d 158, 163 (3d Cir. 2014), *aff'd*, 578 U.S. 901 (2016)).

[179]  *Merrill Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 813 (1986).

[180]  *Del. ex rel. Dunn v. Purdue Pharma L.P.*, 2018 WL 1942363, at *2 (D. Del. Apr. 25, 2018).

[181]  *Sanyo Elec.*, 2019 WL 1650067, at *6 (citing *Gunn*, 568 U.S. at 259).

-47-

territorial limits, the Court need only interpret the License's words. Such an undertaking doesn't "turn on . . . construction of federal law."[182] Nor is "federal law . . . an essential element" of a breach-of-contract claim.[183] Indeed, that is why, not long ago, Delaware's federal district court sent *Sanyo Electric Co., Ltd. v. Intel Corporation*[184] back to the Court of Chancery. There, the district court found the parties' claims—which, as here, arose from a cross-license—posed the "core question" of "whether Intel may rightfully make or sell wireless communication models used in [a third party's] computers" consistent with the license's prohibitions.[185] Finding this "purely an issue of state law contract interpretation," the district court held the claims did not "arise under any Act of Congress relating to patents" and did not "otherwise require application or interpretation of patent law."[186] On remand, the Court of Chancery ruled accordingly. It resolved the case on breach-of-contract grounds by interpreting the parties' license "as written."[187]

The Court has jurisdiction to do the same. And now, it will.

---

[182] *Dunn*, 2018 WL 1942363, at *2 (internal quotation marks omitted).

[183] *Id.* (citing *Smith v. Kan. City Title & Tr. Co.*, 255 U.S. 180 (1921)).

[184] 2019 WL 1650067 (D. Del. Apr. 17, 2019).

[185] *Id.* at *6.

[186] *Id.* (internal quotation marks and citations omitted).

[187] *Sanyo Elec.*, 2021 WL 747719, at *6.

## 2. The License Plainly Prohibits Intermec from Using TransCore's Intellectual Property in the Transportation Markets.

Under the License, the Company granted Intermec a "royalty-free right" to market Company Licensed Patents.[188]  That privilege came with spatial boundaries. Intermec only could deploy Company Licensed Patents "outside the Transportation Markets."[189]  And it could not "make, . . . use, lease, offer to sell, sell, export [or] import . . . Company Licensed Products" inside the Transportation Markets.[190]  Read together, these terms plainly keep Intermec's implementation of TransCore's intellectual property out of the Transportation Markets.

What this language intends, neighboring language guarantees.  Closing all dimensions, the No Rights Inside the Transportation Markets provision declares the License "does not expressly, by implication or otherwise confer on Intermec" the "right" to "Company Licensed Patents" "in" "the Transportation Markets."[191] And, because "Company Licensed Products" are those that, "but for" the License, "would infringe" "Company Licensed Patents,"[192] it follows deductively that this

---

[188]  License § X1-2.3.

[189]  *Id.*

[190]  *Id.*

[191]  *Id.* § X2-1.13.

[192]  *Id.* § X1-1.19.

restriction banishes Intermec's use of Company Licensed Products from inside the Transportation Markets as well.

Read as a whole, these provisions permit Intermec to commercialize TransCore's intellectual property everywhere but inside the Transportation Markets. Their plain language, therefore, authorizes a breach claim against Intermec if Intermec nevertheless deploys TransCore's intellectual property inside the Transportation Markets. Accordingly, if discovery establishes Intermec's recent "projects" meet the Transportation Markets definition and involve TransCore's Licensed Patents, Products, or both, Intermec may be liable for breach. Intermec's attempt to dismiss this count is **DENIED**.

Intermec's contrary arguments misconstrue TransCore's allegations. The Company doesn't contend, as Intermec believes,[193] that Intermec is totally banned from the Transportation Markets, *e.g.*, also from marketing *Intermec* Licensed Patents and Products inside the Transportation Markets. Instead, the Company contends the Transportation Markets restrictions block Intermec's use of *TransCore* Licensed Patents and Products inside the Transportation Markets. As explained, that contention is supported by the License's plain language. Given that Intermec's antitrust theory, too, is based exclusively on this misperception,[194] it has offered no

---

[193] *See* Intermec Dismissal Br. at 19–20.

[194] *Id.* at 8 nn.18, 20.

alternative explanation as to why a generic contract restriction masks a complex trade conspiracy. So the Court need not consider it.

### 3. Because the License's Plain Language Governs the Transportation Markets, the Company's Implied Covenant Claim Fails.

As a fallback, TransCore pleads an implied covenant claim for misuse. But the implied covenant "cannot be used to vary a contract's express terms."[195] "[E]xpress contractual provisions 'always supersede' the implied covenant," and so "an implied covenant claim will not survive a motion to dismiss" if it, in fact, "duplicates" an express breach-of-contract claim.[196] Here, TransCore's Transportation Markets misuse claim is controlled by the License's plain language— so, there's a viable claim for express breach. TransCore's implied covenant claim is, therefore, impermissibly duplicative.[197] Accordingly, Intermec's motion against it is **GRANTED**.

---

[195] *Buck*, 2021 WL 673459, at *5; *see Nemec*, 991 A.2d at 1125–26 ("[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement." (alteration in original) (quoting *Dunlap*, 878 A.2d at 441)).

[196] *Bandera*, 2019 WL 4927053, at *22 (quoting *Gerber*, 67 A.3d at 419).

[197] *E.g.*, *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) ("The implied covenant . . . cannot be invoked to override the express terms of a contract. Thus, if the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable." (internal quotation marks and citations omitted)); *accord Buck*, 2021 WL 673459, at *5 (dismissing an implied covenant claim that "merely repackage[d]" a breach-of-contract claim).

### F. INTERMEC'S BREACH-OF-CONTRACT COUNT STATES A CLAIM UNLESS IT IS LATER FOUND TIME-BARRED.

Having resolved Intermec's dismissal motion, the Court now turns to the parties' cross Rule 12(c) motions.

Intermec alleges TransCore breached the License by failing to correct the underpayments the Auditor revealed.[198]  Given the FR, it is reasonably conceivable that TransCore underpaid Intermec a number of times during the Company's 2012–16 fiscal years.  As its principal argument in defense, TransCore contends this claim is time-barred.  Invoking Delaware's contractual statute of limitations, the Company urges the time for litigating its alleged underpayments elapsed at some point in 2019—*i.e.*, three years after the last quarter in the 2012–16 Reports ended. The question here, then, is whether Intermec waited too long to recover the balance. It might have, but disputed terms in the License prevent a decision at this stage.

---

[198] Intermec also alleges, in a single sentence, that "[u]pon information and belief," TransCore has, since the audit, "continually failed to pay all royalties."  Compl. ¶ 32.  This is a conclusory allegation not entitled to truth.  *See Price*, 26 A.3d at 166 (holding that a court need not consider "conclusory allegations unsupported by specific facts").  As a result, it cannot support a breach claim independent of the underpayment allegations discussed below.  But because TransCore has not moved against this "part" of Intermec's breach-of-contract count, *see generally* TransCore JP Br., the Court's rejection of it should have no bearing on the motions' dispositions.  To the extent, however, judgment is required, Intermec's motion for entry of judgment is denied as to this unsupported piece of its breach-of-contract claim.

**1. This Claim Implicates the Contractual Statute of Limitations.**

The statute of limitations for a breach-of-contract claim is three years.[199] The clock starts on the date that the cause of action accrued.[200] And a breach-of-contract claim accrues "at the time the contract is broken, not at the time when the actual damage results or is ascertained."[201] Put differently, the statute is triggered as soon as the breach occurs, even if the aggrieved plaintiff is ignorant of the breach.[202] "[D]raconian in nature[,]" a court cannot "extend the limitations period out of notions of fair play."[203] So when the claim, facially, falls outside the limitations

---

[199] *Wedderien v. Collins*, 2007 WL 3262148, at *4 (Del. Nov. 6, 2007); *see generally* Del. Code Ann. tit. 10, § 8106 (2020).

[200] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 768 (Del. 2013).

[201] *Worrel v. Farmers Bank of State of Del.*, 430 A.2d 469, 472 (Del. 1981) (internal quotation marks omitted).

[202] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004); *see SmithKline Beecham Pharms. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 450 (Del. 2000) (observing that Delaware's contractual statute of limitations "is not a discovery statute" and so, absent tolling, constructive knowledge of the breach is enough to trigger the statutory period (internal quotation marks omitted)).

[203] *Trustwave Holdings, Inc. v. Beazley Ins. Co., Inc.*, 2019 WL 4785866, at *4 (Del. Super. Ct. Sept. 30, 2019) (internal quotation marks and citation omitted); *accord Thomas v. Headlands Tech Principal Holdings, L.P.*, 2020 WL 5946962, at *8 (Del. Super. Ct. Sept. 22, 2020); *see Scharf v. Edgcomb Corp.*, 864 A.2d 909, 920 (Del. 2004) ("All statutes of limitations . . . are, by their very nature, harsh. . . . When a plaintiff fails to file a timely complaint, a jurisdictional defect is created that cannot be excused." (cleaned up)).

period, the plaintiff bears the burden of pleading facts leading to a reasonable inference that a tolling exception applies.[204]

Though Intermec disputes the statute's application, it does not contend TransCore has invoked the wrong law. Three years, then, will be the measure if the statute applies.

### 2. At this Stage, the Audit Provision is Ambiguous, So TransCore's Statute of Limitations Defense Must be Deferred.

Intermec received the FR on March 27, 2017. It filed its complaint less than three years later—March 25, 2020—alleging TransCore breached the Audit Provision in failing to remit the underpaid total the FR calculated. Facially, Intermec's allegations are timely. Ordinarily, that would be the end of this.

But TransCore insists Intermec's breach-of-contract claim cannot be based on the Audit Provision.[205] According to TransCore, the Audit Provision does not create a standalone duty to correct underpayments, but rather, just serves to inform

---

[204] *Laguelle v. Bell Helicopter Textron, Inc.*, 2014 WL 2699880, at *3 (Del. Super. Ct. June 11, 2014) (internal quotation marks omitted).

[205] Apart from its upcoming substantive argument, TransCore contends this claim is barred procedurally because Intermec's complaint does not specifically plead a breach of the Audit Provision. TransCore JP Reply at 4–5. But Delaware's pleading rules do not require the exacting detail or magic words TransCore's technical quibbles wishes they did. Outside contexts not pertinent here (*e.g.*, fraud), Delaware accepts notice pleading. *See generally Avve, Inc. v. Upstack Techs., Inc.*, 2019 WL 1643752, at *5 (Del. Super. Ct. Apr. 12, 2019). And here, the complaint's various references to the audit, the FR, and TransCore's refusal to pay, are more than sufficient to put TransCore on fair notice of this claim. *E.g.*, *KT4 Partners*, 2021 WL 2823567, at *31 ("A plaintiff only has an obligation to put an opposing party on fair notice of its theories." (citing *VLIW Tech.*, 840 A.2d at 611)).

Intermec of past breaches of the standalone payment duties imposed by the Payment Provision. Using that timeframe, TransCore says Intermec's underpayment claim, if true, began accruing in Q2 2016—the last quarter comprising the 2012–16 Reports and the last one the FR found short—and so went stale no later than 2019. As support for that theory, TransCore focuses on the interaction between the Audit and Payment Provisions. In reply, Intermec does too.

The parties' contentions boil down to disagreement over whether the Audit Provision creates a separate payment duty apart from the Payment Provision. Reduced further, they debate the Auditor's authority to render binding judgments. Under the Audit Provision, TransCore has thirty days to imburse Intermec for an "underpayment" that the Auditor "demonstrate[s]."[206] The License does not define "demonstrate." But dictionaries do. And "[u]nder well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."[207]

---

[206] License § X2-3.5.

[207] *Lorillard Tobacco*, 903 A.2d at 738; *accord In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 n.67 (Del. 2020).

Merriam-Webster[208] defines "demonstrate" as "to show clearly" and "to prove or make clear by reasoning or evidence."[209]  Black's, in lieu of "demonstrate," defines "show," a legal synonym, as "to make [facts, etc.] apparent or clear by evidence; to prove. . ."[210]  Central to both is the principle that nothing can be demonstrated unless it is proven.  Because of that, TransCore argues the License does not empower the Auditor to make a final, uncontestable determination that establishes a legal duty to pay for what the Auditor unilaterally views as an underpayment.  Otherwise, TransCore continues, the Auditor would assume the role of an arbitrator who presides over payment dispute proceedings that are not referenced in the Audit Provision's plain language.

TransCore's reading finds support in other License provisions.  For example, in the License's indemnification provisions, the parties drafted "final determination" language, establishing the prospect of a dispute resolution mechanism.[211]  So the

---

[208] Delaware courts, including the Supreme Court, have used Merriam-Webster to define undefined contractual terms.  *E.g.*, *Spintz v. Div. of Fam. Servs.*, 228 A.3d 691, 700 (Del. 2020); *USAA Cas. Ins. Co. v. Carr*, 225 A.3d 357, 360 (Del. 2020); *Aveanna Healthcare*, 2021 WL 3235739, at *32. So, for purposes here, the Court does the same.

[209] *Demonstrate*, MERRIAM-WEBSTER (online ed.), www.merriam-webster.com/dictionary/demonstrate (last visited Aug. 4, 2021).

[210] *Show*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[211] License § X2-5.2.

parties knew how to ground the Audit Provision on a finality requirement if they wanted. They apparently did not. TransCore's reading is a reasonable one.

Intermec, however, has responded with a reasonable reading of its own. Intermec contends the Audit Provision's thirty-day deadline makes clear that TransCore has a legal duty to pay the sum the Auditor computes. Otherwise, Intermec says, the Audit Provision would have no teeth; TransCore would be free to ignore the Auditor, eliminating Intermec's bargained-for audit rights. In line, Intermec contends the absence of "final determination" language indicates TransCore agreed the Auditor's "demonstration" *would* be conclusive (*i.e.*, *de jure* "proved") or, at least, would serve as a benchmark for calculating damages should the parties, after TransCore pays, engage breach litigation involving the correct calculation methodology. A "nonwaiver" provision supports this reading. Under that provision, the parties agreed breach arguments would not be waived just because a party had been forced to acquiesce to a demand (*e.g.*, the FR) it believes is wrongful.[212]

The parties' positions on how the Audit Provision interacts with the Payment Provision entrench the ambiguity more deeply.

According to TransCore, the Auditor cannot "demonstrate" royalties are "underpaid" unless TransCore underpaid when it imbursed the royalties originally.

---

[212] *Id.* § X2-10.3.

In other words, given that, in TransCore's view, the Auditor is limited to "verifying" quarterly reports, the parties agreed the Auditor's sole task is to reveal past breaches of the Payment Provision, litigation on which could have occurred only until Q2–Q3 2019. TransCore adds that, to the extent the Audit Provision, as applied here, revives long overdue breach claims, it violates Delaware public policy by effectively extending the statute of limitations beyond three years.

Intermec fights TransCore's premise, observing the Audit Provision is not necessarily dependent on the Payment Provision. For example, TransCore could breach the Payment Provision by not timely paying. The Audit Provision, however, does not target timeliness breaches, but rather, targets amount-based breaches. The Audit Provision, Intermec adds, also remedies breaches based on the contents of quarterly reports, which the Payment Provision does not capture. In short, Intermec argues the Audit Provision can be separately breached without also breaching the Payment Provision, separating the two and thereby, not extending its Audit Provision breach claim beyond three years.

Both parties have offered reasonable readings of these contested Provisions. At this stage, the Court can't choose.[213] That means the Court also can't decide TransCore's statute of limitations defense yet. Given the parties' arguments, it is reasonably conceivable that this defense hinges on a disputed fact. Namely, did the

---

[213] *Vanderbilt Income*, 691 A.2d at 613.

parties, when contracting, intend that (1) the Audit Provision could be breached independently, in which case Intermec's claims are timely; or (2) the Audit Provision could not be breached independently, in which case Intermec's claims are really based on the Payment Provision and so may be untimely.

If discovery establishes that the second option reflects the only reasonable reading, then Intermec bears the burden of showing a tolling exception applies. Though the parties have spent considerable energy briefing the tolling issue now, it would be premature for the Court to pass on it before the Provisions are properly interpreted. Conversely, if discovery establishes that the first option reflects the only reasonable reading, the tolling issue will be moot.

The parties' dueling motions for judgment on this point are **DENIED**.[214]

---

[214] Through its motion, Intermec also seeks judgment on a "breach-of-contract claim" for TransCore's alleged failure, since 2019, to deliver quarterly reports. *See* Intermec JP Br. at 13–14. This "claim," however, is not alleged in Intermec's breach-of-contract count, which focuses instead on underpaid royalties alone. *See* Compl. ¶¶ 41–48. The sole sentence alluding to missing quarterly reports merely is incorporated by reference and not mentioned again outside Intermec's declaratory count. *Compare* Compl. ¶ 31, *with* Compl. ¶ 41, *and* Compl. ¶¶ 33–39. Indeed, TransCore's motion does not address the reports outside the declaratory context. *See* TransCore JP Br. at 19–21; *cf.* TransCore Opp'n JP. Br. at 23–24.

Briefs and motions do not amend or expand pleadings. *See* Del. Super. Ct. Civ. R. 15(a). And it would be a strain to read Intermec's underpayment allegations as a discrete complaint about a failure to deliver quarterly reports. *But see Malpiede*, 780 A.2d at 1083 (relieving courts of interpretive straining). So the Court won't.

Since this theme will recur, *see infra* note 228, the Court cautions claimants who include multiple "sub-theories" within one count, instead of pleading them as separate counts. Not only are sub-theories easy to miss, but also this Court has held that motions to dismiss (or to trim) parts of claims are invalid. *See inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4–6 (Del. Super. Ct. Jan. 26, 2021). By logical extension, the same could be said, in the appropriate case, for pleading those "parts" in the first place. If a defendant must attack whole

-59-

## G. Intermec's Declaratory Count Fails to a State Claim.

Finally, Intermec seeks declaration that TransCore is obligated: (1) to make past royalty payments; (2) to make ongoing royalty payments; and (3) to deliver quarterly reports. None supports a declaratory judgment.

The Court's power to issue a declaratory judgment derives from the Declaratory Judgment Act.[215] A declaratory judgment "is designed to promote preventative justice."[216] It is "[b]orn out of practical concerns,"[217] providing efficient relief where a traditional remedy is otherwise unavailable.[218] To that end, the Act may be invoked "to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations."[219]

---

counts, a defendant should have whole counts to attack. Otherwise, a plaintiff could be insulated from dismissal by embedding weak theories into strong ones and then claiming they all fall or none fall.

In short, Intermec has not adequately pleaded this "claim" and so the Court doesn't consider it. To the extent judgment is nevertheless required, Intermec's motion is denied in this respect.

[215] Del. Code Ann. tit. 10, § 6501 (2020).

[216] *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1237–38 (Del. Ch. 1987) (quoting *Stabler v. Ramsey*, 88 A.2d 546, 557 (Del. 1952)).

[217] *Id.* at 1238.

[218] *See id.* ("The notion laying behind [declaratory judgments] is that legitimate legal interests are sometimes cast into doubt by the assertion of adverse claims and that, when this occurs, a party who suffers practical consequences ought not to be required to wait upon his adversary for a judicial resolution that will settle the matter.").

[219] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 816 (Del. 2018) (quoting Del. Code Ann. tit. 10, § 6512)).

"Not all disputes, however, are appropriate for judicial review when the parties request it."[220] The Court has discretion to decline declaratory judgment jurisdiction,[221] and will do so where a proposed declaration would not advance the litigation, but rather, would waste judicial resources.[222] To promote those interests, "Delaware courts do not address disagreements that have no significant current impact."[223] Stated prudentially, a declaration would not advance the litigation if it would not resolve an "actual controversy," *e.g.*, a dispute "'in which the claim of . . . is asserted against one who has an interest in contesting the claim'" and in which adversity on the issue exists.[224] Delaware law, also, "requires that a dispute not be moot . . . to avoid wasting judicial resources on academic disputes."[225] And because

---

[220] *Id.*

[221] *See, e.g.*, *Burris v. Cross*, 583 A.2d 1364, 1372 (Del. Super. Ct. 1990); *see also XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216 (Del. 2014) (reviewing a court's decision to exercise declaratory judgment jurisdiction for abuse of discretion).

[222] *E.g.*, *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989) ("[J]udicial resources are limited and must not be squandered on disagreements that have no significant current impact. . . . These judicial concerns are not rendered irrelevant by the declaratory judgment statute and its salutary purpose of advancing the stage of litigation." (internal quotation marks omitted)); *KLM Royal Dutch Airlines v. Checchi*, 698 A.2d 380, 382 (Del. Ch. 1997) ("[T]he objective of [a declaratory judgment] action is to advance the stage of litigation between the parties in order to address the practical effects of present acts of the parties on their future relations.").

[223] *Crescent/Mach I Partners, L.P. v. Dr Pepper Bottling Co. of Tx.*, 962 A.2d 205, 209 (Del. 2008) (internal quotation marks omitted).

[224] *Town of Cheswold*, 188 A.3d at 816 (quoting *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973)).

[225] *Crescent/Mach*, 962 A.2d at 208.

declarations provide relief where "a claim . . . would not support an action under common law pleading rules,"[226] a declaratory claim may not duplicate a properly-pleaded affirmative count.[227] A declaratory count that "does not add anything" will be dismissed.[228]

To begin, Intermec's request for a declaration on TransCore's duty to remit past-due royalties is duplicative. Whether TransCore breached the License necessarily will be decided, positively or negatively, in the resolution of Intermec's express breach-of-contract count. And whether Intermec is entitled to damages, too, necessarily will be resolved through that count and through TransCore's implied covenant count for overpayment. There is, then, no need for a declaration on this issue. Accordingly, TransCore's motion against this request is **GRANTED**.

Next, Intermec's request for a declaration regarding TransCore's "ongoing" duty to pay royalties fails for the simple reason that this issue is not in controversy. Throughout its briefing, TransCore concedes it must pay royalties whenever it sells

---

[226] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *29 (Del. Ch. Nov. 16, 2014).

[227] *US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *10 (Del. Ch. June 18, 2018), *aff'd*, 2019 WL 24460 (Del. Jan. 17, 2019); *Trusa v. Nepo*, 2017 WL 1379594, at *8 n.71 (Del. Ch. Apr. 13, 2017); *Great Hill*, 2014 WL 6703980, at *29; *Veloric*, 2014 WL 4639217, at *20.

[228] *ESG Cap. Partners II, LP v. Passport Special Opportunities Master Fund, LP*, 2015 WL 9060982, at *15 (Del. Ch. Dec. 16, 2015).

a Licensed Product.[229]   There is, therefore, no "uncertainty and insecurity" as to Intermec's right to receive royalties.[230]   Accordingly, this request is **MOOT**.[231]

Finally, Intermec requests a declaration that TransCore must continue to prepare and deliver quarterly reports.   In short, the Court deems this requested declaration moot.  But, to get there, the Court has had to negotiate some distractions.

Intermec alleged tersely that TransCore has failed to provide quarterly reports for about two years.

---

[229] *E.g.*, TransCore JP Opp'n Br. at 18.

[230] *Town of Cheswold*, 188 A.3d at 816 (internal quotation marks omitted).

[231] Intermec purported, through its opening brief, to modify and refine its ongoing-royalties declaration so that it might obtain judgment "based on the gross invoice price . . . pursuant to Section 2.3 of" the License.  Intermec JP Br. at 1, 14.  But Section 2.3 does not mention gross invoice price calculations.  *See* License § X1-2.3 (Intermec's Grants); *id.* § X2-2.3 (Currency Conversion).   More important, neither does Intermec's complaint.  Compl. ¶¶ 33–39.   As explained, briefs do not amend pleadings.  *See supra* note 210.  To the extent Intermec meant, but incorrectly typed, Section 3.2, that section is not a royalty payment provision either.  Instead, Section 3.2 describes what quarterly reports must contain.  *See* License § X2-3.2 (Content of Quarterly Reports).  Indeed, Intermec's complaint purports to acknowledge as much, though it consistently repeats the same numerical error.  *See* Compl. ¶¶ 3, 19, 25, 39.

Morphing again, Intermec, in its reply, says "gross invoice price" comprises part of the definition of Net Sales Value, which is mentioned (implicitly) in its complaint through a reference to Section 3.1 (the Payment Provision).  Pls.' Reply in Supp. of Mot. for J. on Pleadings at 5 (D.I. 41).  To be clear, reply briefs do not amend pleadings either.  *See, e.g.*, *Ethica Corp. Fin. S.r.L v. Dana Inc.*, 2018 WL 3954205, at \*3 & n.37 (Del. Super. Ct. Aug. 16, 2018).  Even so, entertaining this shape shifting would be a strain. It is difficult to interpret Intermec's subject allegations, which solely relate to a flat duty to pay, as a request to settle any dispute the parties may have over the methodology they have used, or the Auditor employed in the FR, to calculate Net Sales Value. *But see Malpiede*, 780 A.2d at 1083.   The Court need not draw unreasonable inferences in Intermec's favor.  *See Price*, 26 A.3d at 166.  Accordingly, the Court will not consider this ever-evolving request for relief, as it had not been pleaded in Intermec's complaint.  To the extent judgment is required, Intermec's motion is denied.

TransCore denied it, adding that it did not "owe any duty to provide quarterly reports."[232] But later, TransCore produced a screenshot of Intermec's own quarterly report portal. The image depicts transmittal messages that indicate Intermec has "received" the very reports (and the royalties they compute) Intermec claimed, in one sentence, TransCore has been wrongfully withholding.[233] The injudiciousness of that filing[234] inspired Intermec to intensify its quarterly report declaration claim on the (*post hoc*) theory that TransCore's double-talk has now caused it uncertainty and insecurity. It also led Intermec to argue that: (1) TransCore's initial denial is a

---

[232] Am. Ans. at Ans. ¶ 31.

[233] *Id.* at Countercls. ¶ 39.



[234] TransCore acknowledged that the Court might "disagree" with its strategy, and explained, if granted a Rule 15 amendment, it would "further clarify its denial" by deleting the comment about not owing a general duty to provide quarterly reports. TransCore JP Opp'n Br. at 23 n.18.

binding admission; and (2) considering the screenshot, at this stage, would be procedural error.

To the Court, this all now seems to have been truly unnecessary.

Given that TransCore repeatedly concedes it must provide quarterly reports,[235]—as it seemingly may well have done for the past two years[236]—the Court need not reach the merits of these arguments. The parties' posturing aside, there just is no controversy supporting Intermec's sought-after declaration anymore. Accordingly, the prayer for it is **DISMISSED** as **MOOT**.

## IV. CONCLUSION

For the foregoing reasons, Intermec's Rule 12(b)(6) motion is **GRANTED IN PART** and **DENIED IN PART**, Intermec's Rule 12(c) motion is **DENIED**, and TransCore's Rule 12(c) motion is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

_____
Paul R. Wallace, Judge

Original to Prothonotary
cc: All Counsel via File & Serve

---

[235] *E.g.*, *id.* at 17; TransCore JP Reply at 2.

[236] *See* n.233, *supra*.